## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, <br> ANTHONY CLARK <br> 9725 Nanjemoy Creek Place <br> Nanjemoy, MD 20662 <br><br>        **Plaintiff-Relator,** <br><br> BRINGING THIS ACTION ON BEHALF OF, <br> THE UNITED STATES OF AMERICA <br><br> c/o UNITED STATES ATTORNEY GENERAL <br> U.S. Department of Justice <br> 950 Pennsylvania Avenue, NW <br> Washington, DC 20530-0001 <br><br> c/o UNITED STATES ATTORNEY <br> 555 4th Street, NW <br> Washington D.C., DC 20530 <br><br>        v. <br><br> VARIQ CORPORATION <br> 2055 L Street NW, Suite 650 <br> Washington, DC 20036 <br><br>        **Defendant.** | **SEALED** <br><br> Case: 1:15−cv−01794 <br> Assigned To : Kollar-Kotelly, Colleen <br> Assign. Date : 10/22/2015 <br> Description: General Civil <br><br>   **JURY DEMANDED** <br><br>   **COMPLAINT FILED UNDER** <br>   **SEAL PURSUANT TO** <br>   **31 U.S.C. § 3730(b)(2)** |

### COMPLAINT

### (Violations of the False Claims Act, 31 U.S.C. § 3129 *et seq.*)

COMES NOW the Plaintiff-Relator Anthony Clark, by and through his attorneys, Kohn,

Kohn & Colapinto, LLP and Webster & Fredrickson, PLLC, on his own behalf and on behalf of

the United States of America, in the above-captioned action states to this Honorable Court as

follows:

RECEIVED <br> OCT 2 2 2015 <br> Clerk, U.S. District & Bankruptcy <br> Courts for the District of Columbia

## INTRODUCTION

1.      This is a civil action brought by Plaintiff-Relator Anthony Clark on behalf of himself and the United States of America ("United States) against the Defendant, the VariQ Corporation ("VariQ"), to recover, under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA"), damages sustained by, and penalties owed to, the United States, as the result of Defendant having knowingly presented or caused to be presented to the United States false claims to obtain government money after falsely representing to the government, as more specifically detailed herein.

2.      Defendant VariQ, engaged in a pattern of conduct that violated the anti-fraud provisions of the federal and state law False Claims Acts, by, among other things, entering into several contracts to obtain government funds by fraud in the inducement by willfully misrepresenting itself as qualified for "HUBZone" certification by the Small Business Administration.  Defendant VariQ was not qualified to be a "HUBZone" employer.  Instead, VariQ falsely claimed that trainees of Byte Back, a non-profit corporation in the District of Columbia, were VariQ employees so that VariQ could falsely represent to the government that it met the statutory criteria to be a "HUBZone" employer.   Defendant VariQ knowingly submitted false claims for payment to the government on several contracts which were awarded to VariQ under false pretenses.

## JURISDICTION

3.      The jurisdiction of this Honorable Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730(a) and 3732.  Defendant VariQ is headquartered in Washington, D.C. and transacts business therein, and events and transactions related to the alleged violations took place in the District of Columbia.

4.      Venue lies in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), as well as 31 U.S.C. § 3732(a), because much of the contractual work performed by Defendant took place in this district, Defendant does business in this district and is headquartered here.

5.      This suit is not based upon prior public disclosures of the allegations contained herein and to the best of Plaintiff-Relator's knowledge there has been no public disclosure of the allegations contained in this Complaint.  In the event that a public disclosure has occurred, Plaintiff is an original source of all such disclosures pursuant to 31 U.S.C. §3730(e)(4). Plaintiff-Relator has direct and independent knowledge of the information on which the allegations are based and he has complied with all conditions to be an original source.

6.      Pursuant to the requirements of the False Claims Act, 31 U.S.C § 3730(b), Plaintiff-Relator Clark has provided the Government, through the United States Attorney General and the United States Attorney, with a written disclosure of material evidence and information regarding these allegations prior to filing this action, and Plaintiff-Relator has served the United States with copies of this Complaint and the Plaintiff-Relator's written disclosure.

**PARTIES**

7.      Plaintiff-Relator Anthony Clark is an adult resident of Nanjemoy, Maryland.  He was employed by Byte Back, Inc., a District of Columbia non-profit corporation that provides computer literacy and job training.  Byte Back hired Plaintiff-Relator in May 2014 as the Director of Byte Back's IT Academy.  As the Director of the IT Academy, Plaintiff-Relator Clark oversaw Byte Back's certification training program wherein Byte Back would provide classes to individuals seeking a certificate in various computer disciplines.

8.      Defendant VariQ is a company with headquarters in the District of Columbia and Maryland.  VariQ maintains contracts with several federal agencies and the District of Columbia

3

providing security and information technology services.  Defendant VariQ represents that it is HUBZone certified. VariQ is a "person" subject to the False Claims Act under 31 U.S.C. § 3133(l)(4).

## FACTS GIVING RISE TO RELIEF

## BACKGROUND AND OVERVIEW

9.      Defendant VariQ and others engaged in a pattern of conduct that violated the anti-fraud provisions of the False Claims Act.  Defendant VariQ, among other things, entered into an arrangement whereby VariQ would falsely claim that Byte Back trainees were employees of VariQ so that VariQ could willfully misrepresent that it met the requirements for HUBZone certification.

10.      By making willful misrepresentations to the Small Business Administration that it met the requirements for HUBZone certification under the HUBZone Act of 1997, 15 U.S.C. § 631, VariQ enjoyed a competitive advantage in bidding for federal contracts and won several of such contracts under false pretenses.  VariQ also was awarded several contracts specifically set-aside for HUBZone employers.

11.      The United States has paid VariQ millions of dollars on contracts where the government bargained for the provision of jobs to residents of underserved HUBZone communities, through the HUBZone program, but did not receive the benefit of that bargain because of VariQ's fraudulent conduct.

12.      Similarly, VariQ falsely represented that it met the statutory criteria to be a Certified Business Enterprise to receive bidding preferences for District of Columbia government contracts.

13.     Defendant VariQ had full knowledge that it did not meet the requirements for certification under the HUBZone program or the Certified Business Enterprise Program.

14.     Each and every instance where VariQ submitted invoices to the United States and the District of Columbia when it knew it did not meet the criteria for HUBZone certification or inclusion in the Certified Business Enterprise Program, VariQ knowingly submitted false claims to the United States and the District of Columbia.

## THE HUBZONE PROGRAM

15.     The Historically Underutilized Business Zones (HUBZone) program was enacted into law as part of the Small Business Reauthorization Act of 1997. The program falls under the auspices of the U.S. Small Business Administration ("SBA") and encourages economic development in historically underutilized business zones – "HUBZones" - through the establishment of preferences.

16.     The purpose of the HUBZone program is to promote economic development and employment growth in distressed areas by providing access to more federal contracting opportunities.

17.     The HUBZone program's benefits for HUBZone-certified companies include competitive and sole source contracting and a 10% price evaluation preference in full and open contract competitions, as well as subcontracting opportunities.

18.     To qualify for the HUBZone program, a firm must meet the following criteria:

    a.     It must be a small business by SBA standards;

    b.     It must be owned and controlled at least 51% by U.S. citizens, or a Community Development Corporation, an agricultural cooperative, or an Indian tribe;

        c.     Its principal office must be located within a "Historically Underutilized Business Zone," which includes lands considered "Indian Country" and military facilities closed by the Base Realignment and Closure Act;

        d.     At least 35% of its employees must reside in a HUBZone.

19.    To become a HUBZone employer it must submit a completed application and represent to SBA that it meets the requirements set forth in 13 C.F.R § 126.200.

20.    After submitting the application, applicants must notify SBA of any material changes that could affect its eligibility. The company must also submit any additional information required by SBA.

21.    Such material changes include a change in the ownership, a change in business structure, a change in principal office, and falling below the 35% employee HUBZone residency requirement.

22.    Every time a qualified HUBZone company submits an offer and is awarded a HUBZone contract, it must meet all of the HUBZone Program's eligibility requirements, including the employee residency requirement at the time it submits its initial offer and up until and including the time of award.

23.    Only bona fide employees of a HUBZone participant are counted in determining if a company or concern is qualified to participate in the HUBZone program:

> Employee means all individuals employed on a full-time, part-time, or other basis, so long as that individual works a minimum of 40 hours per month. This includes employees obtained from a temporary employee agency, leasing concern, or through a union agreement or co-employed pursuant to a professional employer organization agreement. SBA will consider the totality of the circumstances, including criteria used by the IRS for Federal income tax purposes and those set forth in SBA's Size Policy Statement No. 1, in determining whether individuals are employees of a concern. Volunteers (i.e., individuals who receive deferred compensation or no compensation, including no in-kind compensation, for work performed) are not considered employees. However, if an individual has an

6

ownership interest in and works for the HUBZone SBC a minimum of 40 hours per month, that owner is considered an employee regardless of whether or not the individual receives compensation.

13 C.F.R § 126.103.

24.    The Federal government presumes a loss to the United States based on the total amount expended on the contract, subcontract, cooperative agreement, cooperative research and development agreement, or grant whenever it is established that a business concern other than a HUBZone company willfully sought and received the award by misrepresentation.

25.    A company certifies to the Federal government that it is a HUBZone company any time it submits a bid, proposal, application or offer for a Federal grant, contract, subcontract, or cooperative agreement intended for award to HUBZone companies.

26.    Similarly, a company certifies to the Federal government that it is a HUBZone company in any instance where it submits a bid, proposal, application or offer for a Federal grant, contract, or subcontract which in any way encourages a Federal agency to classify the bid or proposal, if awarded, as an award to a HUBZone company.

27.    A company certifies to the Federal government that it is a HUBZone company in any instance where it registers on any Federal electronic database for the purpose of being considered for award of a Federal grant, contract, subcontract, cooperative agreement, or cooperative research and development agreement, as a HUBZone company.

28.    Under the Federal regulations, each offer, proposal, bid, or application for a Federal contract, subcontract, or grant shall contain a certification concerning the HUBZone status of a business concern seeking the Federal contract, subcontract or grant. An authorized official must sign the certification on the same page containing the HUBZone status claimed by the concern.

7

## VARIQ CONSPIRES TO CIRCUMVENT THE RESIDENCY RULES

29.     Plaintiff-Relator Clark learned through correspondence and conversations with Byte Back officials, including but not limited to Executive Director Kelley Ellsworth, that, due to its expansion, fewer than 35% of VariQ's employees resided in HUBZones in or around May 2014.

30.     Among other discussions, VariQ considered hiring several janitors to meet the HUBZone requirements and circumvent the rules.

31.     Instead, VariQ settled on a plan whereby it would claim Byte Back trainees as employees to falsely claim that it met the HUBZone program's residency requirement.

32.     Byte Back Executive Director Ellsworth offered Plaintiff-Relator Anthony Clark a position as Byte Back's Director of IT Academy.

33.     Plaintiff-Relator Clark joined Byte Back on or about May 16, 2014, attending Byte Back events before starting work in the Byte Back offices on May 19, 2014.

34.     On May 30, 2014, Executive Director Ellsworth sent Plaintiff-Relator Clark an email containing a proposed memorandum of understanding between Byte Back and VariQ.

35.     The stated purpose of the agreement was to "Provide opportunities with VariQ for HUBZone resident Byte back students or graduates."

36.     This was to be accomplished by "VariQ employing individuals on a part time (10 hour per week) basis to serve internships with community service or other organizations that will serve as further training to those individuals."

37.     At no point did VariQ intend that the Byte Back trainees would be bona fide employees of VariQ.

8

38.     Byte Back trainees (or students) were enrolled in the Byte Back IT Academy to learn computer skills as part of several certification programs. Among the classes offered were the "Administrative Assistant Course" to prepare for the "IC3 Certification"; the "CompTIA A+ Certification Program" for computer support technicians; the "CompTIA Linux+ Certification Program"; the "CompTIA Security+ Program"; the "Microsoft Office Specialist Certification Program"; the "MOS Trainer Certification" program.

39.     Byte Back students and trainees spent approximately 12 hours per week in classes.

40.     Byte Back trainees did not provide any services on behalf of VariQ or services for VariQ.

41.     VariQ did not control any actions of any of the Byte Back trainees nor did VariQ control what will be done and how it will be done.

42.     VariQ did not select any of the trainees for qualifications other than their residence in a HUBZone.

43.     VariQ did not supervise any of the Byte Back trainees in any of their duties—the trainees had no duties on behalf of VariQ.

44.     The Byte Back trainees did not perform any tasks performed by regular employees of VariQ.

45.     On June 7, 2014, Plaintiff-Relator Clark expressed concerns about the VariQ proposal in an email to Executive Director Ellsworth.

46.     Plaintiff-Relator Clark stated to Executive Director Ellsworth that he was concerned that Byte Back was "helping VariQ skirt the intent of the HubZone requirements."

47.     In a follow up meeting on or about June 9 or 10, 2014, Plaintiff-Relator Clark met with Executive Director Ellsworth and Eleanor Grewal, Director of Programs, to expand on his concerns over the VariQ agreement with Byte Back.

48.     Executive Director Ellsworth insisted that Plaintiff-Relator Clark sign off on the agreement between VariQ and Byte Back immediately.  Plaintiff-Relator Clark refused as he wanted to know more about the legality of the arrangement.

49.     On June 13, 2014, Executive Director Ellsworth sent Andrew Rodnan, VariQ Director of Operations, an email with a signed copy of the Memorandum of Understanding agreement back-dated to cover the period of June 1, 2014 to May 31, 2016.

50.     On June 18, 2014, Rodnan sent Executive Director Ellsworth an email with the fully signed agreement attached.

51.     Rodnan further explained in the June 18, 2014 email that VariQ was working to "develop a comprehensive package of onboarding (and offboarding) documents and other items that will streamline the process for our new Byte Back graduated employees."  Rodnan also provided the fully executed Memorandum of Understanding to Byte Back. (Ex. ___.)

52.     The "onboarding" process entailed Byte Back's identification of trainees who lived in HubZones.  Byte Back would provide a list of such students to VariQ so VariQ could claim them as employees.

53.     Byte Back would create and provide tax forms and other evidence of employment.

54.     VariQ planned on paying the trainees through Byte Back.

55.     When Plaintiff-Relator Clark asked how VariQ could claim these trainees as employees, Executive Director Ellsworth explained that VariQ would have a cover story that

companies often send employees to training but in this case, VariQ would just happen to decide that these trainees' services are no longer required after the completion of their training.

56.　VariQ and Byte Back planned that VariQ would claim only current Byte Back trainees as VariQ employees. The trainees would provide no services to VariQ. As soon as the trainee completed the course with Byte Back, the trainee would be "fired" from VariQ, requiring this streamlined process for bringing on and letting go new "employees."

57.　Following some investigation into the HUBZone requirements, on or about July 11, 2014, Plaintiff-Relator Clark restated to Executive Director Ellsworth that he was very uncomfortable with the VariQ agreement. Executive Director Ellsworth continued to insist that Plaintiff-Relator Clark sign off on the agreement.

58.　Also on July 11, 2014, Rodnan informed Executive Director Ellsworth, Plaintiff-Relator Clark, and others at Byte Back that he was "pulling together a package of required employment documents, instructions, and other materials" for use with the scheme which was used to fraudulently classify Byte Back trainees as VariQ employees.

59.　On or about July 25, 2014, Executive Director Ellsworth emailed Plaintiff-Relator the finalized information regarding the VariQ plan, including a a letter Byte Back could use to promote its relationship with VariQ.

60.　Prior to Plaintiff-Relator Clark's resistance and opposition to VariQ's illegal scheme to defraud the United States, Executive Director Ellsworth, more than anyone at Byte Back, was the most enthusiastic and supportive of Plaintiff-Relator Clark.

61.　Byte Back's dramatic change in attitude towards Plaintiff-Relator Clark following his resistance to the fraudulent scheme reflects knowledge by VariQ of the violations alleged herein given the influence that VariQ had over Byte Back.

62.     Executive Director Ellsworth continually complimented Plaintiff-Relator Clark's work, ideas, and appearance (telling him, at their first meeting at his office location, that she was glad he had shed "the lawyer's suits" and he was "really fitting in").  At that same meeting, which was a series of interviews for a position that reported to Plaintiff-Relator Clark, Ellsworth several times commented positively on how Mr. Clark had set up the interviews, down to the small details of his having prepared packets for each participant with copies of resumes, cover letters, interview questions, writing pads, pens, etc. On that occasion and several others, Ellsworth made a point of thanking Plaintiff-Relator for bringing such "excellent management and organizational expertise, which has been sorely lacking" at Byte Back.

63.     Moreover, Executive Director Ellsworth knew that VariQ's plan to claim Byte Back trainees as VariQ employees was illegal.  Ellsworth spoke of the plan far differently with Plaintiff-Relator Clark than she did with other staff, volunteers, or the public.

64.     In private discussions with Plaintiff-Relator Clark, Executive Director Ellsworth stressed the importance of doing this "favor" for VariQ so that they would not lose their HUBZone status and so that they would continue to support Byte Back financially.

65.     In public, Ellsworth described the project simply as a donation-in-kind from VariQ, employing Byte Back students as VariQ paid interns, turning a "$50,000 donation [the amount VariQ pledged to provide to Byte Back to pay the interns the first year] into millions of dollars in potential income," the aggregate amount that each student might earn, were they to secure full-time employment after graduation and participation in the "internship" program.

66.     Ellsworth never told the staff or the public that VariQ no longer met the HUBZone requirements, that Byte Back would be pretending their students were actual VariQ employees simply to make sure that VariQ once again met those HUBZone requirements, or that

Byte Back students would not in fact perform any actual work for VariQ, despite being classified as "employees" of VariQ.

67.    Ellsworth also consistently made it clear that she knew that Byte Back would pretend that its trainees were VariQ employees. Ellsworth even ordered Abdullah Alnassar and Plaintiff-Relator Clark to find suitable internship opportunities at third-party companies for the Byte Back students which would then allow VariQ to classify these students as their own employees, solely for the purposes of making it appear to the government that VariQ continued to meet the HUBZone threshold when, in fact, it did not.

68.    In private conversations between Plaintiff-Relator Clark and Ellsworth, Ellsworth made clear that she viewed this arrangement as helping VariQ to falsely appear to meet the requirements of the HUBZones program while knowing all along that VariQ was not in fact meeting those requirements. Ellsworth stated more than once in conversations with Plaintiff-Relator Clark that "they [VariQ] need to be in compliance quickly, and they were going to just hire a huge janitorial staff that they didn't need, and just pay them to meet the requirements. Our way is better for both of us."

69.    More than once, Ellsworth explicitly stated to Plaintiff-Relator Clark she knew that under her scheme Byte Back would be enabling VariQ to claim Byte Back students as VariQ employees when they not only would not in fact be VariQ employees, but actually would be working for other employers.

70.    Plaintiff-Relator Clark, on June 7, 2014, first expressed concern of the proposed agreement between VariQ and Byte Back to Executive Director Ellsworth. Plaintiff-Relator Clark expressed further reservations about the agreement in a June 9, 2014 meeting.

13

71.     In that meeting Plaintiff-Relator Clark met with Ellsworth and Eleanor Grewal, in Ellsworth's office and told Ellsworth and Eleanor Grewal that he was concerned that Ellsworth's proposed deal with VariQ was illegal.  Ellsworth and Eleanor Grewal exchanged silent, worried glances.

72.     When Plaintiff-Relator Clark told Ellsworth and Eleanor Grewal that he was trying to ascertain, quietly, if Ellsworth and VariQ's proposed plan to certify Byte Back students as VariQ employees would be within the law and regulations, Ellsworth and Eleanor Grewal both snapped at him, telling him that he should just ask the Small Business Administration directly - because, in their view, that would be the "quickest" way to resolve Plaintiff-Relator's concerns.

73.     Over the course of his conversations with Ellsworth, the two main reasons that Ellsworth provided for her insistence on completing the arrangement with VariQ were:

        a. VariQ was out of compliance with HUBZone requirements having had grown large quickly and no longer employing the minimum percentage from HUBZones.  As a "neighbor and friend" of Ellsworth's, Ellsworth had agreed to "help them out with their problem"; and

        b. Ellsworth was assured of a financial quid pro quo for Byte Back from VariQ, and she did not want to jeopardize that windfall by not providing VariQ with the means to appear to be in compliance.

74.     VariQ had proposed that if the scheme were completed, VariQ would continue and potentially increase financial assistance to Byte Back.

75.     On or about July 11, 2014, Executive Director Ellsworth directed Plaintiff-Relator Clark to personally sign off on the agreement between VariQ and Byte Back.  Ellsworth so

14

insisted even though there were individuals both above and below Plaintiff-Relator Clark in the organization who already were involved in the project and who would continue to do the actual work involved, Eleanor Grewal and Abdullah Alnassar.

76.     Executive Director Ellsworth had created an atmosphere of significant urgency with respect to the VariQ deal, continually bringing it up to Plaintiff-Relator Clark in person, in phone calls and in emails.  Ellsworth acted as if she and Byte Back needed to complete the agreement quickly.

77.     Plaintiff-Relator Clark refused to sign off on the agreement.

78.     Immediately following Plaintiff-Relator Clark's refusal to sign off on Byte Back's efforts to aid VariQ in its fraud, Executive Director Ellsworth became even more hostile towards Plaintiff-Relator Clark.

79.     Executive Director Ellsworth's demeanor toward Plaintiff-Relator Clark changed entirely, becoming cold and distant.

80.     For instance, on that same day, July 11, 2014, Ellsworth, without warning or discussion, directed Plaintiff-Relator Clark to terminate the employment of one of his subordinates.

81.     As Plaintiff-Relator Clark continued to investigate the VariQ/Byte Back scheme, discreetly asking former colleagues about it (all of whom said the scheme was illegal and/or highly inappropriate), his concerns consequently grew.

82.     Plaintiff-Relator Clark shared his additional concerns with Ellsworth.  At that point, Ellsworth began to bring up several new and unfounded areas of criticism of Plaintiff-Relator Clark.

15

83.     On or about July 22 and July 23, 2014, immediately after Plaintiff-Relator Clark expressed grave concerns over the VariQ/Byte Back scheme, Ellsworth harassed Plaintiff-Relator Clark in a long e-mail chain regarding an inconsequential matter concerning data reports.

84.     After telling Ellsworth that he would not be comfortable signing off on the VariQ/Byte Back scheme, on or about July 24, 2014, Ellsworth falsely accused Plaintiff-Relator Clark of insubordination in a very hostile manner.  Ellsworth called Plaintiff-Relator Clark to accuse him of being "publicly insolent and insubordinate.

85.     On or about July 25, 2014, Plaintiff-Relator Clark again discussed his concerns regarding the VariQ/Byte Back agreement with Ellsworth.  Plaintiff-Relator Clark spoke with Ellsworth at the end of the Byte Back graduation ceremony. Plaintiff-Relator Clark told Ellsworth explicitly that in his opinion the VariQ scheme was illegal, that if Byte Back participated in it, Byte Back would be helping VariQ to break the law, and that, given the fact that Ellsworth was resigning, Plaintiff-Relator Clark would make sure that Byte Back stopped participating in it.

86.     Ellsworth became very upset with Plaintiff-Relator Clark.

87.     That day, Ellsworth emailed Plaintiff-Relator Clark to inform him that she had received a draft letter from VariQ which Byte Back could use to promote the relationship between Byte Back and VariQ..

88.     As Plaintiff-Relator Clark continued to express his serious reservations about VariQ, the more Ellsworth found fault with him.

89.     On or about July 26, 2014, at a Byte Back Board retreat, Plaintiff-Relator Clark expressed his concerns about Ellsworth and the VariQ scheme to the Board. Several Board

members told Plaintiff-Relator Clark that they had not known several details of what Ellsworth had been planned or the details of her activities, including the VariQ scheme.

90.     On or about July 27, 2014, Plaintiff-Relator Clark spoke by phone with Byte Back Board member Mario Burney and discussed with him at length Byte Back's liability due to Ellsworth's actions in the VariQ scheme. Burney informed Plaintiff-Relator Clark that the Board had initiated Ellsworth's resignation, telling her that if she did not resign, she would be let go. Burney also asked Plaintiff-Relator to continue to provide information to the Board about Ellsworth's conduct, activities, and behavior.

91.     Plaintiff-Relator Clark further disclosed his concerns over the VariQ/Byte Back agreement to Board members on or about July 28, 2014). Plaintiff-Relator Clark told Burney that Executive Director Ellsworth was a liability to Byte Back because of, among other things, the VariQ proposal. Plaintiff-Relator Clark detailed the ways in which Ellsworth had pressured him to sign off on the VariQ scheme and how it was illegal. Plaintiff-Relator Clark shared his concerns with Burney that Byte Back would be liable not only for Ellsworth's illegal activity in regard to VariQ, but in Ellsworth's firing of several Byte Back employees;

92.     On August 1, 2014, Plaintiff-Relator Clark spoke with Byte Back Board Member Keith Clark about Ellsworth. Plaintiff-Relator Clark told Board Member Clark that he believed the VariQ/Byte Back arrangement was illegal. Plaintiff-Relator Clark explained to Board Member Clark at length that by providing VariQ with the means to falsely claim that Byte Back students who resided in a HUBZone were VariQ employees, VariQ could then falsely claim to the government that VariQ met the minimum threshold for maintaining HUBZone certification. Plaintiff-Relator Clark told Board Member Clark that Byte Back would not only be breaking the law in doing so, but would be open to further liability. Board Member Clark assured Plaintiff-

17

Relator Clark that Ellsworth could not fire him, and asked that Plaintiff-Relator continue to provide information about Ellsworth's conduct.

93.     Also on August 1, 2014, Plaintiff-Relator Clark wrote an email to board members Keith Clark and Mario Burney regarding his concerns over the VariQ plan to claim Byte back trainees as VariQ employees.

94.     Plaintiff-Relator Clark explained in his August 1, 2014 email that at the time he joined Byte Back, Executive Director Ellsworth was "already well into working out an agreement" with Byte Back.

95.     Plaintiff-Relator Clark also alleged in the August 1, 2014 email that the "plan appeared to circumvent the spirit, and perhaps the letter, of the HUBZone program."

96.     As well, Plaintiff-Relator Clark stated in the August 1, 2014 email that Byte Back and VariQ would not have been in compliance with the HUBZone program "without a major change to [Byte Back's] internship program."

97.     Plaintiff-Relator Clark explained in the August 1, 2014 email to the two Board members: "The bottom line is this: the HUBZone program was designed to help specific areas grow economically, by requiring not only the business to be located there, but to have 35% of their employees live in a HUBZone.  That designation grants a firm federal benefits. It was designed to help individuals and HUBZone firms, not businesses to skirt the rules just to get the benefits. VariQ recently expanded quickly, and no longer meets the 35% employee requirement. The way Kelley [Ellsworth]'s plan would work is that VariQ will pay Byte Back students who live in a HUBZone $10 a hour to be in our classes/internships, and VariQ will classify our students as their employees so that VariQ may continue to enjoy the federal benefits of the HUBZone program . . . For me and for many, it doesn't pass the smell test."

98.     That week, shortly after Plaintiff-Relator Clark's disclosure of wrongful and fraudulent conduct and efforts to stop what Plaintiff-Relator reasonably believed to be illegal and fraudulent conduct, Executive Director Ellsworth increased her efforts to make a case to fire Plaintiff-Relator.

99.     Ellsworth terminated Plaintiff-Relator Clark's employment from Byte Back on August 15, 2014.  The nature and timing of this termination demonstrates knowledge on the part of VariQ and others that the scheme to classify Byte Back students as "employees" of VariQ was illegal and part of a fraudulent scheme in violation of the False Claims Act.

100.    Plaintiff-Relator Clark spoke with Byte Back Board Member Burney on August 16, 2014.  Burney relayed to Clark that he and the other Byte Back Board Members were shocked and disappointed about the way he was fired.  Burney relayed that Plaintiff-Relator Clark had performed very well but that the Board did not have the authority to override Executive Director Ellsworth.  Burney also stated that Ellsworth made several accusations against Plaintiff-Relator which he (and other Board members) disagreed with, but that the Board was unable to prevent the termination.

## VARIQ HAS BEEN AWARDED MILLIONS OF DOLLARS IN CONTRACTS AWARDED ON FRAUDULENT GROUNDS

101.    From 2014 to date, VariQ has been awarded several Federal contracts and has had many modifications of contracts and other transactions with the Federal government wherein VariQ was required to certify that it was a HUBZone firm.

102.    VariQ entered into agreements with the Department of Treasury (IDV Procurement Instrument No. TPDCFPBA130021; and Procurement Instrument No. TEPV1514265,TFCEN12F0027;          TIRN011D00079,          TIRN011D000700002, TIRN011D000700003, TIRN011D000700004, TIRN011D000700005), the Department of

Agriculture (AG32KWD12022B, AG3198K130087), the General Services Administration (GS14H15AAA0024, GH35F0389V), the Department of Health and Human Services (HHSH250201400070I, HHSN276201300002B, HHSN276201300006, HHSN276201300007, HHSN276201300008, HHSN276201300009, HHSN276201300010, HHSN276201300011, HHSN276201300012, HHSN276201300013, HHSN276201300014, HHSN276201300015, HHSN276201300016, HHSN276201300017, HHSN276201300018, HHSN276201300019, HHSN276201300020, HHSN276201300021, HHSN276201300022, HHSN276201300025), the Department of Homeland Security (HSCETC14J00127, HSCG23114JP17184, HSCG3814J410005, HSHQDC13DE2044, HSHQDC14J00222,HSHQDC14J00532, HSHQDC14J00480, HSSCCG15J00025) the Department of Defense (N0017811D6726, N0060412F3157, N6523613D5814, S5121A13M0006), the Pension Benefit Guaranty Corporation (PBGC01DO140009), the Department of State (SAQMMA15D0006), the Securities and Exchange Commission (SECHQ115D0032), and the Department of Justice (DJBP0700NASP9M10032).

103. Millions of dollars of these contracts were specifically set aside for HUBZone employers. Indeed around the same time VariQ sought to falsely claim Byte Back trainees as its employees to falsely claim it had satisfied its requirements to maintain its status as a HUBZone employer, VariQ entered into a $3,395,430 agreement with the Department of Homeland Security that was a HUBZone set-aside exclusively for HUBZone employers. (HSHQDC14J00222.) VariQ signed the agreement on May 22, 2014, just as it was negotiating with Byte Back to claim trainees as employees.

104. In addition, the Department of Homeland security awarded VariQ an additional HUBZone set-aside contract for $206,988 on August 14, 2014. (HSCG2314P17184.)

105.    On September 23, 2014, VariQ signed a $3,935,484 contract with the Department of Homeland Security (HSHQDC14J00532).  This contract is a firm fixed price contract with the National Protection and Programs Acquisition Division. This contract was a HUBZone set-aside, open only to HUBZone firms.

106.    VariQ was also awarded a $1,000,696 contract with the Department of Homeland Security on September 24, 2014 which was also a HUBZone set-aside.  (HSHQDC14J00480.)

107.    VariQ was awarded a $1,865,750 contract with the Internal Revenue Service, TIRN011D000700005, This contract was a HUBZone sole source set aside.

108.    Likewise, VariQ was awarded a contract with the Department of Defense, S5121A13M0006, which is also a HUBZone set aside.  The obligated amount between two purchase orders is $556,575 (February 5, 2015 purchase order of $485, 750 and a June 24, 2014 purchase order of $70,825).

109.    Between the contracts with the Department of Homeland Security, Department of Defense, and the IRS, VariQ was awarded nearly $11 million in contracts specifically set aside for HUBZone employers based on VariQ's false representations that it was a HUBZone employer.

110.    VariQ was awarded millions more in other contracts while falsely representing that it is a HUBZone employer. For instance, on September 24, 2014, VariQ signed a $6,619,789 contract with the Department of Homeland Security (contract ID HSCG3814J410005).  This contract is a firm fixed price contract with the Aviation Logistics Center with the U.S. Coast Guard.

111.    On October 14, 2014, VariQ signed a $1,743,950 contract with the Department of the Treasury, Bureau of Engraving and Printing (TEPV1514265).

112.    On September 29, 2014, VariQ signed a $3,351,750 contract with the Department of the Treasury, Internal Revenue Service (TIRNO11D000700004).  This is a cost plus fixed fee contract.  VariQ was the sole bidder on the contract, which was awarded with a small business set aside.

113.    On August 29, 2014, VariQ signed a $3,063,759 contract with the Department of the Treasury, Internal Revenue Service (TIRNO11D000700003).  This is a cost plus fixed fee contract.  VariQ was the sole bidder on the contract, which was awarded with a small business set aside.

114.    On February 15, 2015, VariQ was awarded a contract of $11,777,269 by the Department of Homeland Security.  (HSSCCG15J00025.)

115.    In each case, VariQ falsely represented itself as a HUBZone employer and enjoyed the competitive benefits associated with that status.

116.    The combined loss to the United States is the total amount expended on the contracts awarded to VariQ in those instances where it falsely certified it was a HUBZone employer.

117.    The total amount obligated to VariQ between January 1, 2014 and June 17, 2015 approaches $57,000,000.

118.    In requesting and receiving millions of dollars of money from the Federal government while willfully misrepresenting itself as a HUBZone firm and fraudulently representing Byte Back trainees as its employees, and by obtaining other federal funds, Defendant VariQ has engaged in fraudulent conduct to submit false claims for payment or approval by the United States, by, *inter alia*, falsely representing they are in compliance with federal laws and regulations governing HUBZone certification, which is a core prerequisite for

representing itself as a HUBZone-qualified firm and placement on an SBA-maintained list of HUBZone companies. Defendant VariQ had, and continues to have, actual knowledge that it is not complying with its obligations under the law, that their representations of compliance were and are false, and that Defendants therefore were and are submitting false or fraudulent representations of compliance. Alternatively, Defendants continue to act and have acted with deliberate indifference and reckless disregard as to the truth or falsity of the claims for payment. Plaintiff-Relator Clark asserts causes of action under the False Claims Act for submission of knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(A) and (B); for conspiracy to commit such violations, in violation of 31 U.S.C. § 3729(a)(1)(C); for violations of 31 U.S.C. § 3729(a)(1)(D), for failing to return money or property belonging to the United States; for violations of 31 U.S.C. § 3729(a)(1)(A), (B) and (G), for "reverse" false claims and knowingly making, using or causing to be made or used, a false record or statement that is material to an obligation, whether fixed or not, to pay or transmit money or property to the Government, and knowingly concealing or knowingly and improperly avoiding or decreasing an obligation, whether fixed or not, to transmit money or property to the Government resulting from an express or implied grantor-grantee or contractual relationship, from statute or regulation, or from the retention of any overpayment.

**COUNT I**
**(Violations of the False Claims Act**
**31 U.S.C. § 3729 (a)(1)(A)**
**Presenting False Claims for Payment)**

119.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

23

120.    Plaintiff-Relator seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

121.    As set forth above, Defendant VariQ knowingly and willfully misrepresented its self as eligible for the HUBZone program.   Defendant VariQ presented, or caused to be presented, false or fraudulent claims for payment on contracts it had fraudulently obtained.

122.    The United States paid to Defendant VariQ related grants and funding because of such false or fraudulent claims.

123.    In performing all of the acts described herein, Defendant VariQ has defrauded the United States of America by violating 31 U.S.C. §§ 3729(a)(1)(A), to the damage of the Treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.  In carrying out these wrongful acts, Defendant VariQ has engaged in a protracted course and pattern of fraudulent conduct that was material to false claims for payment that Defendant VariQ presented or caused to be presented to the United States.

124.    As a direct and proximate result of Defendants' fraudulent and illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly scores of false claims and spent millions of dollars.

125.    By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

126.    Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims.  Defendants are liable to the United States for three times the full amount of these damages, plus interest.

127.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**COUNT II**
**(Violations of the False Claims Act**
**31 U.S.C. § 3729 (a)(1)(B)**
**Use of False Statements and Certifications)**

128.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

129.    Defendant VariQ violated Section 3729(a)(1)(B) of the False Claims Act, as amended. As set forth above, Defendant VariQ knowingly made, used, and caused to be made and used, false records and statements material to the false or fraudulent claims for federal grants and funding.

130.    Defendant VariQ knowingly made false statements and false certifications in order to obtain all contracts after May 2014, with full knowledge that these false statements and false certifications would be material to the United States' decision to pay.

131.    As a direct and proximate result of Defendant VariQ's fraudulent and illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly scores of false claims and spent millions of dollars.

132.    By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

133.    Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims.  Defendant VariQ is liable to the United States for three times the full amount of these damages, plus interest.

134.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## COUNT III
### (Violations of 31 U.S.C. §3729(a)(1)(C)

135.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

136.    Defendants VariQ has conspired with others (including but not limited to Byte Back) to commit the violations of the False Claims Act, 31 U.S.C. § 3729(a), described above in Counts I-II.

137.    In performing all of the acts described herein, Defendant VariQ has defrauded the United States of America by conspiring to violate 31 U.S.C. §§ 3729(a)(1)(A), (B), (D) and (G), in contravention of the False Claims Act, U.S.C. §3729(a)(1)(C), to the damage of the Treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.  In carrying out these wrongful acts, Defendant VariQ has engaged in a course and pattern of fraudulent conduct that was material to false claims for payment that Defendant VariQ presented or caused to be presented to the United States.

138.    As a direct and proximate result of Defendant VariQ's fraudulent and illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly scores of false claims and spent millions of dollars.

139.    Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims.  Defendant VariQ is liable to the United States for three times the full amount of these damages, plus interest.

26

140.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**COUNT IV**
**(Violations of the False Claims Act**
**31 U.S.C. § 3729 (a)(1)(G)**
**Reverse False Claims)**

141.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

142.    Defendant VariQ violated Section 3729(a)(1)(G) of the False Claims Act, as amended. As set forth above, Defendant VariQ knowingly made, used or caused to be made or used a false record or statement material to an obligation to pay or transmit funds to the Government improperly obtained for federal grants and funding, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

143.    Defendant VariQ knowingly made false statements and false certifications in order to obtain all contracts after May 2014, with full knowledge that these false statements and false certifications would be material to the United States' decision to pay.

144.    As a direct and proximate result of Defendant VariQ's fraudulent and illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly scores of false claims and spent millions of dollars.

145.    By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

146.   Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims and any related obligations of Defendant to pay or transmit money to the Government.  Defendant VariQ is liable to the United States for three times the full amount of these damages, plus interest.

147.   Each and every such violation is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, request that judgment be entered in their favor and against defendant Defendants as follows:

(a)  That this Court enter a judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained;

(b) That Plaintiff-Relator be awarded all reasonable attorney fees and costs incurred, with interest, including expert witness fees;

(c) That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds of the action or settlement of the claims or alternative remedies under the False Claims Act, 31 U.S.C. § 3730(c)(5), (d);

(d) That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(e)  That Plaintiff-Relator be granted a trial by jury;

(f) That Plaintiff-Relator and the United States be awarded pre-judgment interest;

(g) That Plaintiff-Relator be granted any and all preliminary and permanent injunctive relief, as appropriate;

(h) That Plaintiff-Relator be granted any and all other relief set forth in the False Claims Act which was not specifically referenced above;

(i) That Plaintiff-Relator be granted all other relief as may be appropriate.

## JURY TRIAL DEMANDED

Plaintiff-Relator demands a trial by jury

Respectfully submitted,

Geoffrey H. Simpson #988437
Bruce A. Fredrickson #933044
Webster & Fredrickson, PLLC
1775 K Street, NW, Suite 600
Washington, DC 20006
Phone: (202) 659-8510
Fax:    (202) 659-4082

and

David K. Colapinto #416390
Kohn, Kohn & Colapinto, LLP
3233 P Street, N.W.
Washington, D.C.  20007-2756
Phone: (202) 342-6980
Fax:    (202) 342-6984

Attorneys for Mr. Clark

October 21, 2015